Filed 4/17/23  P. v. Mondragon CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>FERNANDO RAMIREZ MONDRAGON,<br><br>      Defendant and Appellant. | H047341<br>(Santa Clara County<br>Super. Ct. No. F1870372) |

Defendant Fernando Ramirez Mondragon was convicted by a jury of multiple counts of committing lewd and lascivious acts on two children—his stepdaughter and her cousin.  (Former Pen. Code, § 288.)[1]  On appeal, he argues that the trial court erred by admitting insufficiently authenticated Facebook messages that were not adoptive admissions, instructing the jury that it could consider evidence of any charged offense as evidence of his propensity to commit other charged offenses, and instructing the jury that it could consider expert testimony as to Child Sexual Abuse Accommodation Syndrome (CSAAS) to evaluate the witnesses' believability.  Mondragon further argues that the prosecutor committed misconduct by vouching for one of the complaining witnesses, that

---

[1] Unspecified statutory references are to the Penal Code.

cumulative error requires reversal of his convictions, and that his fines and fees must be stayed because of his inability to pay. We affirm the judgment.

## I. BACKGROUND

### A. *The Operative Information*

On December 18, 2018, the Santa Clara County District Attorney filed an amended information charging Mondragon with five counts of committing a lewd and lascivious act on a child (victim S.D.) under the age of 14 by force, violence, duress, menace, or fear (former § 288, subd. (b)(1), amended by Stats. 1995, ch. 890, § 1; counts 1-5), two counts of committing a lewd and lascivious act on a child (victim S.D.) under the age of 14 or 15 (former § 288, subd. (c)(1), amended by Stats. 1998, ch. 925, § 2; counts 6-7), and one count of committing a lewd and lascivious act on a child (victim H.D.) (former § 288, subd. (a), amended by Stats. 1998, ch. 925, § 2; count 8). Counts 1 through 5 were alleged to have been committed between January 16, 1997, and January 15, 2003; counts 6 and 7 were alleged to have been committed between January 16, 2003 and January 15, 2005; and count 8 was alleged to have been committed between January 1, 2000 and December 31, 2003. As to all counts, it was alleged that Mondragon had been convicted in the present case or in another case of committing an offense against multiple victims within the meaning of the "One Strike" law (§ 667.61, subds. (b) & (e)).

### B. *The Trial*

#### 1. *Counts 1-7*

When N.H. first met Mondragon, N.H. already had three daughters from a prior relationship, including S.D., the middle child, who was born in 1989.[2] N.H. married Mondragon in 1996, and the family moved with N.H.'s mother to a house in Gilroy.

---

[2] S.D. was 30 years old at the time of Mondragon's trial.

Both bathrooms were on the first floor, and there were two bedrooms on each floor. N.H.'s mother stayed in one of the downstairs bedrooms, and S.D. and her two sisters stayed in one of the upstairs bedrooms.

In 1997, Mondragon stopped working for about a year because he injured his hand. Mondragon would often be left home alone with the children, though N.H.'s mother was also "always there" and was "in and out all day." N.H.'s mother helped dress the children in the morning, sent them to school, and was usually at home when the children returned. N.H. started work at a barbershop on weekdays at 9:00 a.m. and did not get back until 6:30 p.m., and she also worked on Sundays. As N.H. was often busy, she "always" had someone helping with the children. Other relatives and close friends, in addition to N.H.'s mother, sometimes stayed at the house. Starting in 1998, Mondragon started to work at the same barbershop as N.H.

N.H. thought that Mondragon treated S.D. differently from her two sisters. Mondragon always said that S.D. was the "dirtiest" and "laziest" out of N.H.'s three daughters, and he was always picking on her and teasing her; S.D. was more rebellious and always had an attitude. N.H. and Mondragon had three other children together, born in the first three years of their marriage.

S.D. was afraid of Mondragon. He yelled and physically disciplined her—pushing her, spanking her, and pinching her hard enough to leave bruises. Mondragon also singled S.D. out and "nitpick[ed]" at her—he always told her to clean and take care of her brothers, and she was tasked with more chores than her siblings. S.D. complained to N.H. and told her that Mondragon was physically hitting her.[3] Sometimes Mondragon would hit her until she cried, and he would tell her to go upstairs to her bedroom so nobody would see her crying.

---

[3] N.H. testified that she never saw injuries on S.D., and S.D. never told her about any physical abuse until S.D. disclosed her abuse to the police.

Mondragon first touched S.D. inappropriately when she was seven years old, around when Mondragon and N.H.'s first child was born. S.D. had just gotten out of the shower. Mondragon was waiting in S.D.'s bedroom and had pornographic magazines on the bed. He tried to show them to S.D. and asked her if "[her] boobs [look] like this?" This made S.D. uncomfortable, but Mondragon persisted, telling her, "Let me see. Take off your towel." When she didn't comply, Mondragon "forcefully [took] it off." S.D. tried to cover herself using her hands, but Mondragon moved her hands away and "grabb[ed]" her breasts, saying, "Look, . . . you're growing. . . . [H]ow fast you're growing." He told S.D. that she would have "really big boobs when [she grew] up." Mondragon made S.D. bend over so he could examine her buttocks, and he spread her buttocks apart. S.D. cried. Mondragon seemed "nervous, but he was trying to be kind about it." He told S.D. to stop crying and that what he was doing was "okay" because he was her "dad." But he also told her not to tell her mother. Before he left, Mondragon told S.D. to get changed and to "hurry up to start cleaning."

The next week, Mondragon similarly accosted S.D. after she emerged from the shower. These post-shower incidents continued on a weekly basis for the next two years, "as many times as he [could] do it without [S.D.'s mother] being around." Mondragon would either wait upstairs for S.D. to finish showering, or he would enter the bathroom. Sometimes he would watch S.D. shower. S.D. initially tried to avert contact in her bedroom by changing her clothes in the bathroom, but Mondragon would "always try to find his way" to open the door while she was changing. S.D. also tried to run past Mondragon, but he would either stop her or yell at her if she made it past him.

Oftentimes, Mondragon used S.D.'s younger half-brother as an excuse to intrude on her in the bathroom: he would open the door to send in her brother, ostensibly so S.D. could bathe the younger child; Mondragon would stare at S.D. while she was naked and sometimes touch her.

4

Mondragon would sometimes take S.D. into the other bathroom, next to the kitchen. He would hit and yell at her to get her into the bathroom, and he would shut the door and lock it once inside. Mondragon would make her take her shirt off and would touch her breasts, telling her he needed to see if her breasts had grown. Mondragon would also try to take S.D.'s pants off, but she would fight him off and yell at him. Mondragon would yell back that S.D. was the one who was doing something wrong because she should not be yelling at him. S.D. estimated that Mondragon pulled her into the kitchen bathroom "a good 20 times" over a period of several years.

Starting when S.D. was around 10 years old, Mondragon began to penetrate her vagina with his fingers. Typically, Mondragon would run upstairs in the morning, using the opportunity to catch S.D. still in bed, hit her buttocks, and push his fingers into her vagina "really hard." By that time, S.D.'s older sister was using another bedroom, and S.D.'s younger sister often woke earlier. Even though S.D. was always clothed, Mondragon would use enough force that even over her underwear and pants, his fingers would penetrate through.[4] S.D. tried to prevent Mondragon from touching her by getting up as soon as she heard his footsteps on the stairs. Or, if she was already awake, she tried to walk past him. S.D. would shout at Mondragon to stop touching her, but he would either laugh or walk away. Sometimes, Mondragon would strike and threaten S.D.; he said that he would hurt her mother and her sisters, and he asked her if she wanted her younger siblings to grow up without a father. S.D., who felt abandoned by her own father, believed Mondragon's threats. These incidents continued until S.D. was in high school.

---

[4] In 2017, S.D. told officers that there was no "skin-to-skin" contact between Mondragon and herself.

Mondragon had S.D. drink alcohol for the first time when she was 12 years old. He regularly encouraged her to get drunk, giving her "Mad Dog" and telling her it would get her drunk faster, and then touching her "the most" once she was drunk and less able to resist as he groped her breasts. S.D. drank "very often," perhaps every other week. Several times when S.D. was 13 or 14 years old, S.D. would drink alone with Mondragon. Mondragon would stay sober and tell S.D. that if she wanted to drink, the only way for her to do so would be in his room so her sisters would not see. S.D. sometimes used physical force or raised her voice to resist Mondragon's advances, but no one ever came into the room.

By the time S.D. turned 13 years old, the shower incidents were less frequent, as Mondragon was working more and was going to school. Mondragon still grabbed her breasts and buttocks every few weeks when S.D. was drunk or N.H. was not around. S.D., however, was better able to physically resist Mondragon, and by the time she was 16 or 17 years old, she was more aggressive and assertive in fighting off Mondragon's advances. Mondragon stopped touching S.D. inappropriately when she was 17 or 18 years old.

N.H. had always had her suspicions about Mondragon, but he would "swear on [their] children's lives that he was not doing anything." Mondragon repeatedly told N.H. that she was crazy for thinking he was abusing her children and that she needed help. N.H., however, noticed that Mondragon was always walking out of the bathroom where S.D. was, or knocking on the bathroom door when S.D. was in the bathroom. One time, when S.D. was five years old, Mondragon told N.H. that S.D. had had a fever and had thrown up, and when N.H. went upstairs, S.D. was not wearing a shirt. Mondragon said that he had put S.D.'s shirt in the wash, but N.H. did not think that S.D. had a fever. S.D. also said that " 'something went in my mouth.' " N.H. asked Mondragon what he did, and he said that N.H. was "sick" and that if she thought he had done something wrong,

she should go ahead and call the police. Another time, N.H. came in and saw Mondragon banging on the bathroom door, and N.H. could hear S.D. crying "No. No. Papi."

S.D. never told N.H. that Mondragon was touching her inappropriately, even though N.H. sometimes asked her. Usually when N.H. asked S.D. about Mondragon, he was nearby—Mondragon would stare at S.D. and tell her not to "fucking say anything."

### 2. Count 8

H.D., born in 1991, was S.D.'s younger cousin.[5] H.D. and S.D. were "very close" growing up. H.D. typically saw S.D. every weekend and would go to S.D.'s house in Gilroy to play. H.D. considered Mondragon an uncle.

At age ten or eleven, H.D. spent a night at S.D.'s house and fell asleep in the living room on a mattress on the floor.[6] S.D. was sleeping beside her. H.D. woke up to Mondragon trying to touch her breasts over her clothes. H.D. turned aside to try get Mondragon to stop, but he "kept trying to go again." H.D. turned to her other side, and Mondragon stopped and backed away. Mondragon's brother, who was in the hallway, asked Mondragon if "they" were asleep, and Mondragon answered no.

S.D. recalled the incident; she remembered that she had seen Mondragon come out of his room, so she tried to cover her body to keep him from touching her. S.D. then saw Mondragon try to touch H.D.'s breasts. Mondragon stopped when H.D. moved, waited a few seconds, then touched H.D. again.

The next morning, H.D. told S.D. that Mondragon had touched her overnight. S.D. suggested that H.D. tell N.H., so they went to tell N.H. together. H.D. told N.H. that Mondragon had stood over her and had tried to touch her. N.H. appeared upset and told H.D. to tell her mother, but H.D. was too scared to say anything to her mother.

---

[5] H.D. was 27 years old at the time of Mondragon's trial.

[6] In an earlier interview, H.D. said that she was 12 years old when the incident occurred.

S.D. wanted to see what would happen when H.D. disclosed her abuse. N.H. confronted Mondragon, and S.D. heard them arguing in the bedroom. But nothing more happened to Mondragon, which disappointed S.D. and kept her from disclosing to N.H. her own experience of abuse.

N.H. recalled that S.D. and H.D. had approached her to tell her that Mondragon had molested H.D. N.H. told H.D. to tell her mother, and she also told H.D.'s mother herself. H.D.'s mother told N.H. not to contact the police because she thought her husband would kill Mondragon.

H.D. did not tell anyone else about what happened in the subsequent months, and she continued to go to S.D.'s house afterwards. H.D. tried to keep her distance from Mondragon. She still slept over at S.D.'s house, but she and S.D. would sleep upstairs and make sure that the door was locked, even though they did not discuss the incident. H.D. and S.D. maintained a friendship as they became older, but S.D. never disclosed to H.D. that Mondragon had ever touched her. H.D. later learned that S.D. had gone to the police and had reported that Mondragon had abused her. At the time, H.D. had not told her parents about what Mondragon did to her. About six months before Mondragon's trial, she told her parents about what happened with Mondragon.

### 3. *S.D.'s Disclosure to N.H. and Mondragon's Move to Mexico*

In late 2010, one of S.D.'s sisters disclosed that Mondragon's brother had been abusing her. After her sister's disclosure, S.D. saw that her sister was being supported in her accusation, so she disclosed to N.H. that she had been abused by Mondragon. By that time, S.D. was 22 years old.[7]

---

[7] During her initial interview with police and at the preliminary hearing, S.D. said that she told her mother about Mondragon's abuse when she was 17 or 18 years old.

Afterwards, N.H. and S.D. confronted Mondragon. S.D. told Mondragon that he had to tell N.H. what he used to do to her. S.D. described how he used to take advantage of her—touching her breasts, watching her shower, slapping her buttocks, and penetrating her with his fingers. Mondragon did not deny S.D.'s accusations but started crying, fell to his knees, and apologized. He asked for forgiveness, "admitting everything," and begged S.D. not to call the police, saying that he had been "really young and really stupid." N.H. said it was S.D. who should decide whether to call the police because she was now an adult. S.D. gave Mondragon an ultimatum—if he sought counseling, she would not call the police. S.D. did not want her siblings to grow up without their father like she had.

In the following days, Mondragon continued to ask S.D. not to call the police, saying that he would go to jail for a long time. Although S.D. thought this was manipulative of him, she felt bad for her siblings and did not want to ruin her family. Mondragon told S.D. that he was going to counseling, but she never saw any proof of this. S.D. eventually moved out of the house.

N.H. did not ask Mondragon to leave because her younger children, Mondragon's biological children, were all still at home. N.H. was under the impression that Mondragon was going to see a psychologist or a therapist. She repeatedly asked Mondragon if he was going to seek counseling and reminded him that she would call the police if he did not get help. N.H. did not give Mondragon a set date to seek counseling, but she asked him every few weeks about his progress.

In late 2011, N.H. told Mondragon that she was going to report him to the police because she had no proof that he was actually getting counseling. Two months later, Mondragon left unannounced and called N.H. as he crossed the border to Mexico. He said that he was going to Mexico and that she would never see him again.

While in Mexico, Mondragon would sometimes call S.D., occasionally asking about her body weight, or asking for money.

### 4.    *The Facebook Messages*

After Mondragon left for Mexico, months passed without contact between N.H. and Mondragon other than a threatening message he left her after she disclosed his abuse of S.D. to his sister.  At some point, however, communications between N.H. and Mondragon resumed via Facebook Messenger.  N.H. could not recall at trial which of the two had initiated contact, but the reason N.H. kept in touch with Mondragon was because of her younger children, who became "depressed" after Mondragon left.  N.H. communicated with Mondragon by sending messages to a Facebook account identified by the user name, "Nacho Mondragon."

N.H. and "Nacho Mondragon" exchanged messages in Spanish, and the prosecutor admitted a translated English version and the original Spanish version of the following Facebook messages into evidence as an exhibit:[8]

On October 3, 2013, at 11:09 p.m., N.H. told Mondragon in a lengthy message, "You need to confront your mistakes.  If you come back and deal like a man and get help, perhaps you can live a good life with your children."  A few hours later, Mondragon responded, "I know that I did wrong to you who supported me."  That morning, Mondragon added, "Can I tell you something that they will catch me never."

Also on October 4, Mondragon asked N.H., "One question.! Life is grand and better without you say it."  An hour later, N.H. replied, "To me, life is better without you, without having to see the face of abuse on my daughter."  Mondragon answered five minutes later, saying, "[N.H.] you said that you were or are big I was there and I gave you guys everything now it's your turn.  Show that you're a badass ok.  Ok."

_____

[8] We quote verbatim from the exhibit that was admitted into evidence; the spelling, punctuation, abbreviations are from the original.

On December 2, 2013, at 6:21 p.m., N.H. wrote, "Hello . . . did you forget what you did?  You abused my daughters ASSHOLE!!!!!!!!!!!!!."  Mondragon responded at 10:56 p.m., "By," and then at 11:06 p.m., "Ok sorry [N.H.] you're.  [N.H.] take care."  Also at 11:06 p.m., Mondragon wrote, "I am Glad.  That you are a great woman Hector took care of your children."  Mondragon also asked N.H. to take care of their children.

Also on December 2, 2013, at 11:52 p.m., N.H. wrote, "I hope Chikis [(their son)] doesn't turn out like you . . . [Mondragon's brother] and Lalo . . . and maybe your dad was that way . . .  sick abusers that like little girls."  Mondragon responded on December 3, 2013, at 6:15 a.m., "We weren't like raul[9] or boy [sic] or maximo they were rapists who raped you boby okay normita you're kidding.  You're still sick [N.H.]"  At 1:05 p.m. that same day, N.H. responded in part, "[Y]ou are worse, since you started molesting my daughters since they were 5 years old."  At 9:32 p.m. that day, Mondragon replied, "That you also took your cousin's . . . boyfriend but I was always ahead with other broads and you thought you were the only one there is [N.H.]?  You're such a badass take care and say hello to the neighbor that was by buddy and cool with both."

On December 4, 2013, N.H. wrote to Mondragon at 10:09 p.m. that he did not think about the children and had done "a lot of damage here."  Mondragon responded four minutes later that he loved "my little goats so much[,] I was not there for my girl's 15th nor the graduation for my sons."  At 10:19 p.m., N.H. wrote:  "My daughters would have forgiven you . . . now they hate you because you didn't care about what you did.  You have no remorse.  [Their daughter] said that she didn't enjoy her 15th because you were not there."  Two minutes later, Mondragon responded, "Don't continue."

Also on December 4, 2013, at 10:27 p.m., N.H. sent Mondragon a message saying, "I'm just going to ask you something.  Ask my daughters for forgiveness.  They need to

---

[9] N.H.'s brother, Raul, had been convicted of statutory rape.

11

hear that." Mondragon responded immediately, saying in part, "Thank you for telling me that, but I'm honestly sick. I'm not telling you to make fun of me. I am sick."

### 5. *The Disclosure to the Police*

S.D. believed Mondragon would stay in Mexico, so she saw no need to report him to the police. But this changed in 2017, when she learned that Mondragon had returned to the United States. Fearing for her life, she reported his past abuse to the police.

### 6. *CSAAS Expert*

Psychologist Anna Washington testified as an expert in CSAAS. CSAAS, according to Washington, describes some common aspects of "how [children] might respond to sexual abuse and how they may report about abuse after their experiences." Washington described CSAAS as encompassing five characteristic responses: secrecy; helplessness; feelings of entrapment and accommodation; unconvincing, conflicted, or delayed disclosure of abuse; and retraction. Not all abused children exhibit all the responses characteristic of CSAAS. Washington described the categories as follows:

The first characteristic, secrecy, stems from the preexisting relationship perpetrators often have to a child. The perpetrator may be someone the child knows and loves or who "meets some of [the child's other] needs" and may use "grooming intimidations" or coercion to keep the child quiet.

Helplessness refers to a child's vulnerability. Washington testified that perpetrators of child sexual abuse are usually adults and are both physically stronger and more sophisticated in relationships than children, so children are unable to physically resist or may submit to the abuse because they are made to feel helpless for other reasons.

Entrapment and accommodation, according to Washington, refer to the child's feeling of being trapped in the relationship and the child's mechanisms for coping with the abusive relationship. A child may try to avoid the perpetrator or may develop

12

"internalized mental health problems, like disruptive behavioral problems, substance abuse, or other similar behaviors."

The next characteristic—"delayed, unconvincing, and conflicting disclosures"—Washington testified refutes the "myth" that child sexual abuse victims will tell someone about the abuse right away. According to Washington, the majority of child abuse victims will not disclose the abuse because of their preexisting relationship with their abuser. Even when children do disclose abuse, their disclosures may be inconsistent.

The last characteristic, retraction, involves a child "taking back a previous true allegation of child sexual abuse." Washington testified that retraction occurs "if [the children] realize that telling about the abuse caused something bad to happen."

## C.    *The Verdict and Sentencing*

On March 27, 2019, the jury convicted Mondragon of all counts as charged and found the multiple-victim enhancement allegation to be true. On May 20, 2019, the trial court sentenced Mondragon to prison for a total indeterminate term of 92 years and eight months to life.[10]

## II.    DISCUSSION

## A.    *Facebook Messages*

Mondragon argues that the trial court erred by admitting the Facebook messages because they were insufficiently authenticated and did not qualify as adoptive admissions. We review the trial court's findings as to foundational facts for substantial evidence. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132 (*DeHoyos*).) We review its ultimate determination as to admissibility for abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*); *People v. Chism* (2014) 58 Cal.4th 1266, 1297

---

[10] The trial court sentenced Mondragon to six consecutive terms of 15 years to life for counts 1 through 5 and 8, a middle term of two years for count 6, and eight months (one-third the middle term of 2 years) for count 7.

13

(*Chism*).)  Under these deferential standards, we find no merit in Mondragon's contentions.[11]

### 1.    *Authenticity of the Facebook Messages*

As "writings," the Facebook messages are subject to authentication by "the introduction of evidence sufficient to sustain a finding that [they are] the writing[s] that the proponent of the evidence claims [they are]."  (Evid. Code, §§ 250, 1400.)  The authenticity of a writing can be established by circumstantial evidence and by the contents of the writing itself, and the means of authenticating a document are not limited to those specified in the Evidence Code.  (*People v. Landry* (2016) 2 Cal.5th 52, 87; *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435 (*Valdez*) [MySpace page may be authenticated by items on the page suggesting the identity of owner]; *People v. Cruz* (2020) 46 Cal.App.5th 715 (*Cruz*) [Facebook messages can be adequately authenticated by circumstantial evidence, including the contents of the messages themselves]; Evid. Code, §§ 1410, 1421.)  "The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case.  [Citation.]  The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered.  [Citation.]  Essentially, what is necessary is a prima facie case.  'As long as the evidence would support a finding of authenticity, the writing is admissible.  The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' "  (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)

Substantial evidence supported the trial court's determination that the jury could find the Facebook messages to be genuine communications between N.H. and

---

[11] Given Mondragon's alternative claim of ineffective assistance of counsel, we elect to reach the merits of both the hearsay and lack of authentication claims, despite Mondragon's reliance at trial on solely the hearsay ground.

14

Mondragon.  Gilroy Police Department Officer Hugo Delmoral testified that he was tasked with looking at Facebook messages associated with Mondragon's case.  N.H. gave Delmoral her Facebook password so that he could access her account, and Delmoral found a Facebook profile for a user named "Nacho Mondragon."  Delmoral was able to view messages sent between "Nacho Mondragon" and N.H. from July 2013 until January 2014.  The messages were written in Spanish, which Delmoral was fluent in.  Delmoral wrote a search warrant for the Facebook account.  Facebook responded to the search warrant with records associated with the account, which showed that the account was associated with an email address called "chiki_boys@hotmail.com."

Delmoral found multiple indications that the "Nacho Mondragon" account belonged to Mondragon.  Delmoral knew that "Chikis" was a nickname used by Mondragon's late son.  "Nacho Mondragon" had Mondragon's daughter and son listed as Facebook friends, and the user of the account had sent Mondragon's photograph to other women.  Mondragon's daughter and son sent "Nacho Mondragon" Facebook messages where they would call him "papi," a term of endearment for "dad."  Mondragon's son sent "Nacho Mondragon" photos of himself playing football, and "Nacho Mondragon" sent photos of Mondragon to the son.  N.H. herself testified that Mondragon went by the name "Nacho" and also used the "Nacho Mondragon" Facebook account to communicate with her.  N.H. told Delmoral that she had deleted some messages, but N.H. had confirmed that no messages were deleted from July 2013 to January 2014.  Based on the foregoing, circumstantial evidence dating years before any law enforcement involvement supported the trial court's prima facie determination of the messages' authenticity.  (See *Valdez*, *supra*, 201 Cal.App.4th at p. 1436; *Cruz*, *supra*, 46 Cal.App.4th at pp. 730-731.)

Arguing otherwise, Mondragon relies on *People v. Beckley* (2010) 185 Cal.App.4th 509 (*Beckley*), in which the Court of Appeal considered whether a photograph on a MySpace page depicting a witness allegedly using gang signs was

15

sufficiently authenticated. (*Id.* at p. 515.) Opining that " '[a]nyone can put anything on the Internet' " and that "hackers can adulterate the contents of *any* web-site from *any* location at any time' " (*id.* at pp. 515-516), the court in *Beckley* held that the trial court erred in admitting the photograph in question. (*Id.* at p. 514.) The court further concluded that the trial court erred in admitting a gang roster that appeared on a web page as there was insufficient evidence that the writing was what it purported to be—there was no evidence as to who authored the roster, the officer who obtained the roster did not know who created it, and there was no evidence that the person who created the list had any personal knowledge of the gang's members or that persons on the list were in fact gang members. (*Id.* at pp. 517-518.)

*Beckley* is distinguishable both in the circumstances of the web posting and the purpose for which the evidence was admitted, which as we have noted "will determine what must be shown for authentication." (See *Goldsmith*, *supra*, 59 Cal.4th at p. 267.) Unlike *Beckley*, we are not concerned with the authentication of a photograph for the purpose of proving the action depicted in the photograph—irrespective of the truth of N.H.'s statements in the Facebook Messenger exhibits, the purpose of the exhibits was to document how Mondragon responded to those accusations. "The questions concerning the accuracy and reliability of these Facebook messages differ from the questions concerning the accuracy and reliability of the photographic evidence presented in *Beckley*." (*Cruz*, *supra*, 46 Cal.App.5th at p. 731.) And unlike the gang roster considered in *Beckley*, there was ample circumstantial evidence from which the trial court could find that the writing was what it purported to be—an exchange of messages between N.H. and Mondragon. (See *Beckley*, *supra*, 185 Cal.App.4th at pp. 517-518.)

To the extent Mondragon argues that there was no evidence from Facebook or an Internet Service Provider that established that *he* was the one who sent the messages in reply to N.H. or evidence about how easy or hard it would be for someone to use the

16

"Nacho Mondragon" account or to hack into the "chikis_boys@hotmail.com" e-mail, these arguments go primarily to the *weight* of the evidence, not to its admissibility. "[T]he proponent's threshold authentication burden for admissibility is *not* to establish validity or negate falsity in a categorical fashion, but rather to make a showing on which the trier of fact reasonably could conclude the proffered writing is authentic." (*Valdez*, *supra*, 201 Cal.App.4th at p. 1437.) All that is required to authenticate a writing is a "prima facie case" that the writing is what it purports to be. (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)

Finally, Mondragon relies on *Commonwealth. v. Williams* (Mass. 2010) 926 N.E.2d 1162 (*Williams*). In *Williams*, the Massachusetts Supreme Court that held that MySpace messages purportedly from the defendant's brother to a prosecution witness were insufficiently authenticated, although the MySpace account featured a photo of the defendant's brother, the witness testified generally that the messages she received came from the MySpace account, and the contents of the messages demonstrate a familiarity with the recipient and the defendant's criminal case. (*Id.* at pp. 1172-1173.) *Williams* reasoned that "[a]nalogizing a Myspace Web page to a telephone call, a witness's testimony that he or she has received an incoming call from a person claiming to be 'A,' without more, is insufficient evidence to admit the call as a conversation with 'A.' " (*Id.* at p. 1172.)

The persuasive authority of *Williams* is lessened by its distinguishable facts—there was no evidence in *Williams* that the defendant's brother had ever communicated with the recipient prior to trial, nor was there evidence about the account's communication with other individuals. (*Williams*, *supra*, 926 N.E.2d at p. 1172.) Here, there is

comparatively more circumstantial evidence that "Nacho Mondragon" was used by Mondragon and that Mondragon sent the messages.[12]

Accordingly, we conclude that substantial evidence supports the trial court's determination of foundational facts and that the trial court did not abuse its discretion in deeming these sufficient to overcome Mondragon's authenticity objection. (*DeHoyos*, *supra*, 57 Cal.4th at p. 132; *Goldsmith*, *supra*, 59 Cal.4th at p. 266.) We therefore turn to the merits of Mondragon's hearsay objection.

### 2. *Adoptive Admissions*

" 'There are only two requirements for the introduction of adoptive admissions [under Evid. Code, § 1221]: "(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief in*, the truth of such hearsay statement." [Citation.]' " (*People v. Combs* (2004) 34 Cal.4th 821, 843.) In other words, an adoptive admission can be admitted if a statement was made " ' "under circumstances that would normally call for a response if the statement were untrue" ' " and the recipient of the message responded with " ' "silence, evasion, or equivocation." ' " (*People v.*

---

[12] Mondragon also relies on *State v. Eleck* (Conn.Ct.App. 2011) 23 A.3d 818, a case decided by the Appellate Court of Connecticut but since overruled by the Supreme Court of Connecticut in *State v. Manuel T.* (Conn. 2020) 254 A.3d 278 (*Manuel T.*). In *Manuel T.*, the intermediate appellate court held that the trial court properly excluded Facebook messages where the proponent did not present evidence that the messages came from the purported author and not just from the author's Facebook account. (*State v. Eleck*, *supra*, at p. 824.) But the Supreme Court of Connecticut reversed, holding that authentication of electronic communications—including screenshots of text messages—requires no more than the same "low burden" of prima facie authenticity as other forms of evidence under Connecticut law. (*Manuel T.*, *supra*, 337 Conn. at pp. 294-295.)

18

*Jennings* (2010) 50 Cal.4th 616, 661 (*Jennings*).)[13]  " 'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189-1190 (*Riel*).)  Mondragon argues both that he was not silent in the face of N.H.'s accusations and that his responses were neither evasive nor equivocal.  Mondragon's arguments largely turn on the availability of alternative interpretations for either N.H.'s accusations or Mondragon's responses and are therefore inconsistent with our deferential standard of review.

As a threshold matter, we agree that Mondragon was not merely silent in the face of N.H.'s many accusations.  But it is the content of his various responses that the trial court found to support a reasonable inference of equivocation or evasion, rather than his silence.  Mondragon's contrary arguments uniformly go toward the *weight* of the evidence, not their admissibility.

Mondragon specifically challenges the following statements:

On October 3, 2013, in response to N.H.'s message that he needed to "confront his mistakes" and get help, Mondragon expressly admitted, "I know that I did wrong to you who supported me."

On October 4, when N.H. wrote that her life was better "without having to see the face of abuse on my daughter," Mondragon did not expressly deny N.H.'s accusation of abuse, but responded, "I gave you guys everything now it's your turn."

---

[13] However, an adoptive admission cannot be admitted if there is " 'an inference that [a person] was relying on the right of silence guaranteed by the Fifth Amendment of the United States Constitution.' "  (*Jennings*, *supra*, 50 Cal.4th at p. 661.)

On December 2, 2013, when N.H. wrote, "You abused my daughters ASSHOLE!!!!!!!!!!!!!." Mondragon responded several hours later with only "By," followed a few minutes thereafter with, "Ok sorry . . . [N.H.] take care."

On December 2, 2013, when N.H. wrote that she hoped "Chikis" did not turn out "like you, [Mondragon's brother], and Lalo . . . . sick abusers that like little girls." Mondragon responded the next day, "We weren't like raul or boy [sic] or maximo they were rapists who raped you . . . ."

On December 4, 2013, when N.H. wrote that her daughters "hate you because you didn't care about what you did" and that he had no remorse," Mondragon responded, "Don't continue."

And finally, on December 4, 2013, when N.H. told Mondragon, "Ask my daughters for forgiveness. They need to hear that." Mondragon responded almost immediately, in part saying, "Thank you for telling me that, but I'm honestly sick. I'm not telling you to make fun of me. I am sick."

We discern no abuse of discretion in the trial court's admission of these messages: considered in context, the evidence supported a reasonable inference that Mondragon's responses to N.H.'s accusations were at least evasive and equivocal. (See *Riel*, *supra*, 22 Cal.4th at pp. 1189-1190.) Although Mondragon argues that N.H.'s use of the word "abuse" at various times was itself ambiguous, the trial court legitimately found it reasonable to infer that N.H.'s assertion that Mondragon had "abuse[d]" her daughter would normally call for a response if the statement were untrue, regardless of whether "abuse" could be interpreted as sexual abuse or physical abuse. (*Jennings*, *supra*, 50 Cal.4th at p. 661.)[14] Moreover, Mondragon's arguments that he had a sarcastic tone to

---

[14] Likewise, we note that N.H.'s use of "daughters" instead of "daughter" in her messages does not render her statement any less accusatory. At trial, N.H. clarified that she had used the plural "daughters" in a later text message because she was referencing her daughter who had been abused by Mondragon's brother.

his messages goes toward the weight of the evidence, not its admissibility.  And multiple times, Mondragon did not straightforwardly address N.H.'s accusations—when N.H. said she hoped that "Chikis" did not turn out like him, Mondragon's response was not an unequivocal denial of his "abus[ing] . . . little girls"; instead, he minimized his abuse by alluding to criminals he considered more blameworthy than he, the "rapists who raped you."  And when N.H. accused Mondragon of doing something that made her daughters hate him, Mondragon changed the subject, permitting the court to construe his answer as evasive.  (See *People v. Fauber* (1992) 2 Cal.4th 792, 852 (*Fauber*) [direct accusation is not required for adoptive admission exception to apply].)  Likewise, his response to N.H. after she told him to ask her daughters for forgiveness was not a denial; he arguably acknowledged that he was "honestly sick."

Mondragon argues that even if his statements on their face failed to deny N.H.'s accusations, there is simply insufficient evidence to support the conclusion that he in fact adopted the truth of any of the accusations, relying on *People v. McDaniel* (2019) 38 Cal.App.5th 986.  There, the Fifth Appellate District considered whether a 20-minute text message exchange that included an indirect accusation by the defendant's mother that the defendant had committed several local robberies, which the defendant failed to respond to, constituted an adoptive admission.  (*Id.* at p. 999.)  The *McDaniel* court observed that "given the distinctive nature of text messaging," the defendant's silence following his mother's indirect accusation was insufficient to show that he read the message immediately on receipt or to dispel an inference that he had responded to his mother's statement by other means.  (*Ibid.*)  Unlike *McDaniel*, the trial court's conclusions regarding the foundational facts to support the messages' admission—that Mondragon read and understood the messages, that he could have denied the messages but did not— were supported by substantial evidence, namely the time-stamped responses to each of N.H.'s accusatory messages.  (See *Chism*, *supra*, 58 Cal.4th at p. 1297.)

21

We also reject Mondragon's framing of the Facebook messages as having unfolded over a two-month period, the length of which he asserts would have blurred their meaning and diminished the likelihood that his messages were responsive to N.H.'s. Although Mondragon and N.H. did in fact exchange messages over a period of months, even years, the conversations Mondragon challenges involve discrete exchanges over the course of hours, sometimes even minutes. Mondragon's arguments therefore go toward the weight of the evidence, rather than its admissibility. (See *Fauber*, *supra*, 2 Cal.4th 792, 853 [observations that witness kept eyes closed during conversation, could not identify which person made which statement, and had ingested a lot of cocaine the night prior went toward weight of evidence, not admissibility as adoptive admission].) Mondragon was free to argue his points to the jury. To that end, the trial court properly instructed the jury in accordance with CALCRIM No. 357, which provides that the jury may consider adoptive admissions as true *if* the following elements are met: (1) the statement was made to the defendant or in his presence, (2) the defendant heard and understood the statement, (3) the defendant, under all the circumstances, would have naturally denied the statement if he thought it was not true, and (4) the defendant could have denied the statement but did not. We must presume that the jury followed the instructions that it was given. (*Chism*, *supra*, 58 Cal.4th at p. 1299.) Thus, if the jury found that Mondragon did not read the messages, did not understand the messages, or was not the one who responded to them, the jury would have accorded the evidence no weight. (*Ibid.*)

Based on the foregoing, we conclude that the trial court did not abuse its discretion when it admitted the Facebook messages as adoptive admissions. (*Chism*, *supra*, 58 Cal.4th at p. 1297; *People v. Waidla* (2000) 22 Cal.4th 690, 717; Evid. Code, § 1221.) Furthermore, as "[t]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010), we

22

find no merit in Mondragon's claim the admission of the Facebook messages violated his Fourteenth Amendment due process right to a fair trial.

**B.      *CALCRIM No. 1191B***

Mondragon argues that the trial court erroneously instructed the jury with CALCRIM No. 1191B, which provides that charged sexual offenses can be used as propensity evidence.[15]  He argues that CALCRIM No. 1191B impermissibly expands Evidence Code section 1108 to permit the jury to consider evidence of *charged* sex crimes as evidence of a defendant's propensity to commit other charged sex crimes.[16]  He also argues that CALCRIM No. 1191B violates his federal due process rights as it permits the jury to use a guilty verdict on one count to infer his guilt as to other counts.

Mondragon concedes that his arguments have been foreclosed by the California Supreme Court's decision in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), in which a majority of the California Supreme Court concluded that Evidence Code section 1108 was not limited to offenses other than those for which the defendant is currently on trial.  (*Villatoro*, *supra*, at p. 1161.)  *Villatoro* held that "in authorizing the jury's use of propensity evidence in sex offense cases, [Evidence Code] section 1108 necessarily extends to evidence of *both* charged and uncharged sex offenses, affirming that such evidence is not 'made inadmissible by Section 1101.' " (*Id.* at p. 1162.)

Bound by our Supreme Court's decision, we must reject Mondragon's claim that the trial court erred in giving CALCRIM No. 1191B, as well as his argument that his due process rights were violated by the instruction.  (See *Auto Equity Sales, Inc. v. Superior*

---

[15] The instruction was given to the jury without any objection by Mondragon.

[16] Evidence Code section 1108, subdivision (a) provides:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not made inadmissible pursuant to Section 352."

*Court* (1962) 57 Cal.2d 450, 455; *People v. Meneses* (2019) 41 Cal.App.5th 63, 68 [rejecting due process challenge to CALCRIM No. 1191B under *Villatoro*].)

**C.      *CALCRIM No. 1193***

Mondragon argues that CALCRIM No. 1193 erroneously informed the jurors that they could consider the CSAAS expert's testimony in determining the victim's credibility, lessening the prosecutor's burden of proof.  Although we agree that CALCRIM No. 1193 could be clarified, it is not reasonably likely the jury would have misapplied the instruction on this record.[17]

"We review a claim of instructional error de novo.  [Citation.]  The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is reasonable likelihood the jury applied the instruction in an impermissible manner.' "  (*People v. Rivera* (2019) 7 Cal.5th 309, 326 (*Rivera*).) " 'Moreover, any theoretical possibility of confusion [may be] diminished by the parties' closing arguments.' "  (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, abrogated on a different ground as stated in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

CSAAS expert testimony is inadmissible to prove that a complaining witness has in fact been sexually abused.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.)  It is admissible solely to rehabilitate a complaining witness against a suggestion that the witness's conduct after the abuse was inconsistent with having been abused.  (*Ibid.*)  Thus, the expert testimony may legitimately serve " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain . . . abused children's seemingly self-impeaching behavior."  (*Id.* at p. 301.)

---

[17] Mondragon made no objection when the trial court instructed the jury with CALCRIM No. 1193, but we nonetheless reach the merits of his claims because he contends that the instruction was an incorrect statement of law and affected his substantial rights.  (§ 1259; see *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604.)

24

Here, the jury was instructed with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Anna Washington regarding child sexual abuse accommodation syndrome. Dr. Washington's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [S.D.] and [H.D.]'s conduct was not inconsistent with the conduct of someone who has been molested *and* in evaluating the believability of their testimony." (Italics added.)

Multiple Courts of Appeal have upheld the language of CALCRIM No. 1193, as recited above, as accurately informing the jury of the limited use of CSAAS evidence. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 (*Gonzales*); *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175-176.) Mondragon recognizes these cases but argues that they overlooked the fact that by permitting jurors to use CSAAS testimony to evaluate the complaining witnesses' "believability"—or credibility—the instruction effectively circumvents the prohibition against permitting CSAAS testimony to prove a defendant's guilt.

We acknowledge that the inclusion of "and" in the last sentence of the instruction is susceptible of an interpretation that the jury's use of the CSAAS evidence in evaluating "the believability of [the witnesses'] testimony" might extend beyond merely deciding whether the witnesses' conduct was inconsistent with that of someone who had been molested. But we consider it unlikely on this record that the jury would have applied the instruction in an impermissible manner. (*Rivera*, *supra*, 7 Cal.5th 309, 326.) CALCRIM No. 1193 expressly informs the jury that CSAAS evidence "is not evidence that the defendant committed any of the crimes charged." The expert's testimony was appropriately limited—the expert did not render an opinion as to whether the victims were in fact molested—and the prosecutor did not urge the jury to improperly use the evidence during closing argument. To the contrary, the prosecutor omitted in her

25

paraphrase of the instruction the very "believability of the witnesses" clause that Mondragon finds objectionable, stating only: "You should consider the evidence concerning the syndrome and its effects only for the limited purpose of showing, if it does, that the alleged victims' reactions, as demonstrated by the evidence, are consistent with being molested. Okay?"

Thus, we find no merit in Mondragon's assertion that the reference to the "believability of the witnesses" in CALCRIM No. 1193 would have led the jury to believe that it was free to use the CSAAS evidence as a diagnostic tool—to extrapolate from the witnesses' childhood behavior that he had abused them—rather than a rehabilitative tool permitting the jury to intelligently decide whether their behavior was *self*-impeaching. For these same reasons, we find no merit in Mondragon's claim that the instruction impermissibly lowered the prosecutor's burden of proof. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

## D.     *Prosecutorial Misconduct*

Mondragon argues that the prosecutor committed misconduct in closing argument by vouching for H.D.'s truthfulness. Although defense counsel did not object and therefore forfeited the claim, we address the merits, given Mondragon's alternative argument that his trial counsel was constitutionally ineffective. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125-1126.) Our review of the record satisfies us that no misconduct occurred.

During closing argument, the prosecutor made the following statement: "[H.D.] was complete[ly] honest. She didn't exaggerate. She didn't make things up. She told you what happened. If she really had a dog in this fight and really wanted to go after the defendant, she's now a grown woman. She's sophisticated. She could have said he raped her. She could have said so much worse. She didn't. She has no motive to lie. She hasn't seen him in years. She has moved on. And she is a successful grown woman.

26

There's no reason to make this up. There's no fame. There's no monetary gain. There's nothing, except for the fact she was forced to tell the truth of what happened to her." At no time did defense counsel object.

"A prosecutor may make 'assurances regarding the apparent honesty or reliability' of a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' [Citation.] But a 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' " (*People v. Turner* (2004) 34 Cal.4th 406, 432-433.) For example, in *Turner*, the California Supreme Court held that it was improper for the prosecutor to vouch for expert witnesses based on the prosecutor's personal knowledge of the witnesses and his use of those witnesses when he was a defense attorney. (*Id.* at p. 433.)

In contrast to *Turner*, however, the record in this case does not affirmatively disclose error; it is at best ambiguous what the prosecutor meant by "successful" and "sophisticated," and " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) The prosecutor's argument was largely grounded in evidence apparent from the record: The prosecutor generally asserted that H.D. was credible because of her demeanor on the stand, the consistency of her statements in the course of two interviews and her trial testimony, and her lack of motive to lie given the passage of time and her scarcity of contact with Mondragon. In contrast, instead of referring to S.D. as "successful," the prosecutor focused on the collateral effects of S.D.'s experience of abuse—"poor [S.D.]" and her early alcohol dependence, for example, and her self-reproach on the stand even at age 30, as she called herself "weak" for not having disclosed Mondragon's abuse as a child. In this context, we conclude the jury would have understood the prosecutor's brief characterization of H.D. as a "successful grown

woman" as a comment on the absence of any obvious lingering effects of her isolated experience of abuse (in contrast to S.D.), as well as H.D.'s demeanor on the stand. As for the prosecutor's comment that H.D. is "sophisticated," given the context of the statement—that if she were motivated to lie, she "could have said so much worse"—we see no reason the jury would have understood this as anything more than a comment on H.D.'s measured and articulate answers on both direct and cross-examination. We accordingly reject Mondragon's claim of prosecutorial error.

Even assuming that the prosecutor's comments were misconduct, we would find no prejudice. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [reversal not required for prosecutorial misconduct unless it is reasonably probable result would have been favorable in absence of misconduct].) The prosecutor's statements here were brief and generic. In contrast, the evidence against Mondragon was comparatively strong with respect to H.D.'s allegation of abuse because S.D. supplied direct eyewitness corroboration, and N.H. confirmed H.D.'s fresh complaint. The jury was also instructed that the attorneys' statements—whether in questioning witnesses or in argument—were not evidence. We discern nothing in the record that would overcome our customary presumption that the jury followed the given instructions. (*Chism*, *supra*, 58 Cal.4th at p. 1299.)

## E.     *Cumulative Error*

Mondragon argues that the cumulative effect of all the errors requires reversal of the judgment. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) Having found no error to cumulate, we must reject Mondragon's claim of cumulative error.

28

**F.      *Fines and Fees***

At the sentencing hearing, the trial court imposed a $5,000 restitution fine (§ 1202.4, subd. (b)), a $240 court operations assessment (§ 1465.8), and a $240 criminal conviction assessment (Gov. Code, § 70373).  Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Mondragon argues that all the fines and fees should be stayed as the trial court failed to make a finding that he had the ability to pay them.[18]

We agree with the Attorney General that Mondragon forfeited his challenge to the imposition of fines and fees under *Dueñas*.  The general rule is that challenges to the imposition of fines and fees are forfeited unless an objection is made in the trial court. (*People v. Aguilar* (2015) 60 Cal.4th 862, 866 (*Aguilar*).)  Mondragon made no objections to the imposition of fines and fees at the sentencing hearing held four months after *Dueñas* was decided.  There is accordingly no reason that Mondragon could not have raised a timely *Dueñas* objection at that time.  (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624-625 [*Dueñas* claim forfeited as May 2019 sentencing hearing took place several months after *Dueñas* was decided]; cf. *People v. Santos* (2019) 38 Cal.App.5th 923, 932-933 [failure to object at a pre-*Dueñas* sentencing hearing did not forfeit the claim].)

We also reject Mondragon's alternative contention that his argument is based on a "pure question of law based on undisputed facts," which we may properly review for the first time on appeal.  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153.)  A person's ability to pay fines and fees is at bottom a factual determination.  (*People v. McCullough* (2013) 56 Cal.4th 589, 597.)

---

[18] This issue is currently pending review by the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844.

Equally unavailing is Mondragon's reliance on *People v. Vera* (1997) 15 Cal.4th 269, 276 (*Vera*), disapproved on other grounds in *People v. French* (2008) 43 Cal.4th 36, 47, fn. 3, for the proposition that his *Dueñas* claim implicates "the deprivation of certain fundamental, constitutional rights" cognizable for the first time on appeal. (*Vera*, *supra*, at p. 276.) Our Supreme Court has held that " ' "a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.) *Vera* " 'was not intended to provide defendants with an "end run" around the forfeiture rule,' but was limited to a *narrow class of constitutional rights.' "* (*People v. Linton* (2013) 56 Cal.4th 1146, 1166, italics added.) These rights include "a plea of once in jeopardy and the right to jury trial." (*People v. Tully* (2012) 54 Cal.4th 952, 980, fn. 9.) None of these rights are implicated by Mondragon's *Dueñas* claim.

Accordingly, we conclude that the failure to raise this issue in the trial court has forfeited Mondragon's claim on appeal. (See *Aguilar*, *supra*, 60 Cal.4th at p. 866.)

### III.    DISPOSITION

The judgment is affirmed.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Mondragon*
H047341